# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>ERNEST G.M. ROWLAND,<br><br>Defendant - Appellant. | No.   05-10375<br>D.C. No.  CR-03-00105-ARM |

**JUDGMENT**

**FILED**

DISTRICT COURT OF GUAM

OCT 2 3 2006

MARY L.M. MORAN
CLERK OF COURT

Appeal from the United States District Court for the District Of Guam (Hagatna).

This cause came on to be heard on the Transcript of the Record from the United States District Court for the District Of Guam (Hagatna) and was duly submitted.

On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is **AFFIRMED**.

Filed and entered 07/03/06



A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

OCT 1 2 2006

by:
Deputy Clerk

· FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

ERNEST G.M. ROWLAND,
            *Defendant-Appellant.*

No. 05-10375

D.C. No.
CR-03-00105-ARM

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Guam
Alex R. Munson, Chief Judge, Presiding

Argued and Submitted ·
June 13, 2006—Honolulu, Hawaii

Filed September 13, 2006

Before: Betty B. Fletcher, Harry Pregerson, and
William C. Canby, Jr., Circuit Judges.

Opinion by Judge Pregerson

---

## SUMMARY

---

### Criminal Law and Procedure/Search and Seizure

The court of appeals affirmed a judgment of the district court. The court held, as an issue of first impression, that under Guam law, Guam Customs officers were statutorily authorized to stop and question individuals that they reasonably suspected as violating Guam's drug importation laws, without regard for whether the flight originated in the United States or in a foreign country.

11289

Drug Enforcement Administration (DEA) agents in Guam received a telephone tip that appellant Ernest Rowland was planning to smuggle methamphetamine hydrochloride to Guam from Hawaii. The informant, who contacted the DEA voluntarily and was not motivated by any inducement, identified himself to the agents, provided Rowland's name and his approximate height and weight, and remarked that he was from Hawaii and was on probation. This information was verified by the Hawaii probation department, which also informed the agents that Rowland had previously been convicted of drug offenses. Although the informant had no known track record of reliability, the agents met personally with the informant. They informed Guam Customs and Quarantine (Guam Customs) that they were interested in Rowland, and Rowland's name was placed on a computer "watch list" at the international airport in Guam. When Rowland arrived at the Guam airport on a domestic flight from Honolulu, Hawaii, he executed and submitted a customs agriculture declaration form. Because Rowland's name was in the computer watch system, the customs officer referred him to secondary inspection, where he was observed to be "nervous and sweating mildly." When questioned as to whether he had weapons or narcotics on his person, Rowland admitted, "Yes, I have dope on me." During a strip-search, 464 grams of methamphetamine hydrochloride was found in packets strapped around Rowland's waist, and he was indicted for possession with intent to distribute methamphetamine hydrochloride. The district court denied Rowland's motions to suppress evidence and for pretrial discovery of information related to the confidential informant. Following the denial of his motions, Rowland entered into a conditional guilty plea and was sentenced.

Rowland appealed.

[1] The Guam Code authorized a customs officer to arrest persons violating its drug laws and to seize methamphetamine "imported into Guam." The question as to whether methamphetamine arriving in Guam on a flight originating in Hawaii

was "imported into Guam" within the meaning of the statu-
tory scheme was one of first impression. [2] When a word is
defined in a statute, courts are not at liberty to look beyond
the statutory definition. [3] The customs title of the Guam
Code defined "import" as the "bringing in or introduction of
any controlled substance into any area on Guam." Any con-
trolled substance brought into Guam from outside of Guam
was therefore "imported" within the meaning of Guam's drug
laws. Because Guam customs officers were statutorily
empowered to arrest individuals who "import" drugs into
Guam, and because it was an act of importation to bring drugs
to Guam from the United States, Guam customs officers were
statutorily authorized to stop and seize individuals they sus-
pected of bringing drugs to Guam, even if the person arrived
on a flight originating in the United States. [4] Further,
although Guam was geopolitically part of the United States,
an item passing from the United States into Guam left one
customs territory, and its administration, and entered another.
Therefore, for purposes of Guam customs law, any item arriv-
ing in Guam from outside of Guam, even if coming from the
United States, was subject to customs inspection. [5] Guam
was part of the United States for purposes of federal drug law,
but not for customs purposes.

[6] An officer may stop and question an individual sus-
pected of wrongdoing if the officer can point to specific and
articulable facts which, taken together with rational inferences
from those facts, reasonably warrant that intrusion. When a
court is considering whether an informant's tip is sufficient to
support a finding of probable cause or reasonable suspicion,
the court must employ a totality-of-the-circumstances
approach that takes into consideration the informant's verac-
ity or reliability and his basis of knowledge. [7] Courts look
to several factors to determine the reliability of an informant's
tip. First, a known informant's tip is thought to be more reli-
able than an anonymous informant's tip. Second, an informant
with a proven track record of reliability is considered more
reliable than an unproven informant. Third, the informant's

tip is considered more reliable if the informant reveals the basis of knowledge of the tip. **[8]** In this case, several indicia of reliability supported the informant's tip. **[9]** The informant provided sufficient detail to dispel concerns that the tip was a hoax. **[10]** Although the totality of the circumstances in this case might not have been enough to establish probable cause, the less demanding reasonable suspicion standard was satisfied. The district court's denial of Rowland's motion to suppress evidence had to be affirmed.

**[11]** An informant's identity must be revealed whenever it is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, but the right is not absolute. No fixed rule with respect to disclosure is justifiable, as the public interest in protecting the flow of information against the individual's right to prepare his defense must be balanced. The court must examine the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. The defendant's need for information must be balanced against the value of ensuring the safety of informants. **[12]** A defendant is sometimes entitled to disclosure of the informant's identity, but only after making specific allegations that indicate the portions of the warrant claimed to be false and making a contention of deliberate falsehood or reckless disregard for the truth. Where a defendant has failed to articulate any substantial reason why he should be entitled to the confidential information, disclosure is not appropriate. **[13]** Rowland failed to articulate any specific reasons to disbelieve the informant's testimony. **[14]** The district court's denial of Rowland's motion for pretrial discovery was not an abuse of discretion, and its ruling in this regard and the judgment had to be affirmed.

---

## COUNSEL

John T. Gorman, Federal Public Defender, Mongmong, Guam, for the defendant-appellant.

Karon V. Johnson, Assistant United States Attorney, Hagatna, Guam, for the plaintiff-appellee.

## ORDER

The panel has unanimously voted to grant the petition for panel rehearing. The petition for rehearing en banc is denied as moot. The unpublished memorandum disposition of July 3, 2006, is hereby withdrawn. An opinion shall be filed concurrently with this order.

## OPINION

PREGERSON, Circuit Judge:

Defendant-Appellant Ernest G.M. Rowland appeals the denial of his motion to suppress evidence and his motion for pretrial discovery related to his conviction for possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). We have jurisdiction over this appeal under 28 U.S.C. § 1291 and we affirm. We hold that Guam Customs officers are statutorily authorized to stop any passenger arriving in Guam if the officer has reasonable suspicion to believe that the passenger is violating Guam's drug laws. We also conclude, that the totality of the circumstances in this case gave rise to reasonable suspicion of such a violation, and that the district court did not abuse its discretion when it denied Rowland's motion for pretrial discovery.

### I. Factual and Procedural Background

In October 2003, Drug Enforcement Administration ("DEA") agents in Guam received a telephone tip that Rowland was planning to smuggle methamphetamine hydrochloride to Guam from Hawaii. The informant identified himself[1]

---

[1]Although the gender of the informant is unknown, we refer to the informant as a male.

to the officers, provided Rowland's name and his approximate height and weight, and remarked that Rowland was from Hawaii and was on probation. The informant told DEA Agent Jonathan Anderson that he had contacted the DEA to "bare his soul;" it is undisputed that the informant contacted the DEA voluntarily and was not motivated by a plea offer or other favorable treatment from authorities. After receiving the tip, Agent Anderson and Agent David Taitano contacted the Hawaii Probation Department. The Probation Department confirmed that Rowland was on probation in Hawaii, provided Rowland's date of birth and his physical location, and informed the agents of Rowland's criminal history that included prior drug convictions.

About one week after receiving the tip, Agents Anderson and Taitano met with the informant for about ten minutes to discuss Rowland. In addition to that meeting, the agents spoke with the informant on the telephone about two or three other times. The informant could not tell the agents the specific date that Rowland would travel from Hawaii to Guam. The informant had no known track record of reliability on this or any other case. Agents Anderson and Taitano informed Guam Customs and Quarantine ("Guam Customs") that they were interested in Rowland; Guam Customs placed Rowland's name on a computer "watch list" at A.B. Won Pat International Airport in Guam.

On December 15, 2003, Rowland arrived at the Guam airport on a domestic flight from Honolulu, Hawaii. Although Rowland and the other passengers were not required to pass through *federal* immigration or customs checkpoints, they were required to execute a Guam Customs Agriculture Declaration Form. Rowland presented his form to a Guam Customs Officer, and stated that he would spend roughly one week in Guam and that he did not possess prohibited items or controlled substances.

Because Rowland's name was in the computer watch system, the Guam Customs officer referred Rowland to second-

ary inspection. At secondary inspection, Guam Customs Officer F.J. Quinata asked Rowland if he was carrying any prohibited items. Rowland responded that he was not. Officer Quinata searched Rowland's bag and found nothing. Officer Quinata observed, however, that Rowland "was nervous and sweating mildly during the inspection." Quinata then asked Rowland if he had any weapons or narcotics on his person. Rowland replied, "Yes, I have dope on me." Quinata conducted a strip-search and found 464 grams of methamphetamine hydrochloride in packets strapped around Rowland's waist.

On December 17, 2003, Rowland was indicted for possession with intent to distribute methamphetamine hydrochloride in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). Rowland filed a motion to suppress evidence on March 1, 2004, alleging, *inter alia*, that the Guam Customs officers lacked both probable cause and reasonable suspicion to believe that Rowland was engaged in criminal activity. He simultaneously filed a motion for pretrial discovery of information related to the confidential informant. In its opposition to the motions, the government argued, *inter alia*, that the search was a "border search" that did not require reasonable suspicion or probable cause. In his reply, Rowland contested the assertion that the customs search qualified as a border search. After a brief initial hearing on April 28, 2004, the district court ordered supplemental briefing on the border search issue. On October 5, 2004, the district court conducted a second hearing on the motions and heard testimony from DEA Agent Anderson about his contact with the confidential informant.

On November 3, 2004, the district court denied the motion to suppress. The district court did not reach the question whether the search was a "border search" that did not require reasonable suspicion or probable cause. Instead, the district court held that "the information supplied by the [informant] demonstrated sufficient indicia of reliability so as to provide the DEA with reasonable articulable suspicion justifying the

issuance of the intelligence report and the custom[s] officer's subsequent stop of defendant." The court further concluded that Rowland's statement that he had dope on his body created probable cause that justified the search of his person.

On December 29, 2004, the U.S. magistrate judge in Guam denied Rowland's motion for discovery related to the confidential informant. The magistrate judge concluded that Rowland had not made "a sufficient showing to demonstrate that he is entitled to the information concerning the informant." The magistrate judge found relevant the fact that the government did not intend to use the informant or the information that he provided at trial.

Following the denial of his motions, Rowland entered into a conditional guilty plea with no written plea agreement. On May 6, 2005, he was sentenced to 292 months incarceration and 10 years of supervised release. Rowland filed this timely appeal of the denial of his motion to suppress and his motion for pretrial discovery.

## II. *Standard of Review*

We review the denial of a motion to suppress *de novo*. *See United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). Whether an official acted within his statutory authority is a question of law that we review *de novo*. *See, e.g., United States v. Miller*, 205 F.3d 1098, 1100 (9th Cir. 2000). We also review *de novo* whether reasonable suspicion justified a stop. *See United States v. Miguel*, 368 F.3d 1150, 1153 (9th Cir. 2004). The trial court's factual findings are reviewed for clear error. *See United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

The decision whether to disclose the identity of a confidential informant is reviewed for an abuse of discretion. *See United States v. Henderson*, 241 F.3d 638, 646 (9th Cir. 2000). Nondisclosure is an abuse of discretion only if disclo-

sure is relevant and helpful to the defense of the accused, or essential to a fair determination of the defendant's cause. *See Roviaro v. United States*, 353 U.S. 53, 62 (1957).

III.  *Statutory Authority to Make Stop*

At the outset, we must determine whether Guam Customs officers have the statutory authority to stop an individual that they believe is violating Guam's drug laws. If the officers lack the statutory authority to make such a stop, our cases suggest that the evidence obtained as a result of the stop might be suppressed. *See, e.g., United States v. Juda*, 46 F.3d 961, 968 (9th Cir. 1995) (noting that dismissal of indictment or suppression of evidence might be appropriate remedy for statutorily unauthorized search, but declining to reach the issue); *United States v. Peterson*, 812 F.2d 486, 492-93 (9th Cir. 1987) (noting that suppression might be proper remedy for statutorily unauthorized search, but declining to reach the issue).

[1] "Any [Guam] Customs Officer may: (1) arrest persons who violate a prohibition contained in Article 6 of Title 9 [Guam Code Annotated] Chapter 67; [and] (2) make seizures of any controlled substance imported into Guam in violation of Article 6 of Title 9 [Guam Code Annotated] Chapter 67 . . . ." 5 Guam Code Ann. § 73102(1), (2). Article 6, Chapter 67 is codified at section 67.600-.608 of title 9 of the Guam Code, and pertains to "Importation and Exportation" of controlled substances. Specifically, section 67.601 of title 9 makes it unlawful "to import into Guam any controlled substance in Schedule I or II of this Act," subject to exceptions for approved medical and scientific imports. 9 Guam Code Ann. § 67.601(a). Methamphetamine is a Schedule II substance. *See* 9 Guam Code Ann. § 67.205 (defining Schedule II drugs as those listed in Appendix B); 9 Guam Code Ann. App. B(C)(2) ("methamphetamine"). It thus appears that Guam Customs officers are statutorily authorized to arrest persons and seize methamphetamine "imported into Guam."

The question then becomes whether methamphetamine arriving in Guam on a flight originating in Hawaii is "imported into Guam" within the meaning of the statutory scheme. This is a question of first impression.[2]

Rowland argues that drugs "imported into Guam" must arrive in Guam from a foreign country. Because his flight was a nonstop, *domestic* flight from Hawaii, Rowland argues that the Guam Customs officers lacked statutory authority to stop and question him about suspected violations of Guam's drug laws. In support of this interpretation, Rowland offers four arguments: (1) that the plain meaning of "imported" does not include the authority to stop "domestic" trafficking of controlled substances; (2) that our decision in *United States v. Cabaccang*, 332 F.3d 622 (9th Cir. 2003) (en banc), compels the conclusion that Rowland did not import drugs into Guam; (3) that our decision in *United States v. Mendoza-Ortiz*, 262 F.3d 882 (9th Cir. 2001), requires that the evidence be suppressed in the instant case; and (4) that other sections of the Guam Code support his interpretation of the statute. We find these arguments unpersuasive.

[2] It is a fundamental canon of statutory construction that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Rowland thus argues that "domestic," as set forth in section 67.601 of title 9 of the Guam Code, should be defined as "of or relating to a country's internal affairs," and that importation must therefore implicate non-domestic activities. The problem with Rowland's argument is that he resorts to a common dictionary

---

[2]We also observe that at least one of our decisions has *assumed* that produce sent from Hawaii to Guam is "imported" pursuant to Guam's laws concerning agricultural pests, plant disease, and quarantine. *See Guam Fresh, Inc. v. Ada*, 849 F.2d 436, 436 (9th Cir. 1988). That decision did not address the "importation" question in any detail.

meaning before determining whether the term is "otherwise defined" in the statute. When a word is defined in a statute, "courts are not at liberty to look beyond the statutory definition." *Smith*, 155 F.3d at 1057 (citation omitted).

[3] In this case, the customs title of the Guam Code states that, "[f]or the purpose of this Article, the term *import* means, with respect to any article, any bringing in or introduction of any such article into any area on Guam." 9 Guam Code Ann. § 67.600. Thus, when the next subsection prohibits "import[-ing] into Guam any controlled substance," *see* 9 Guam Code Ann. § 67.601, it prohibits bringing any controlled substances into Guam, regardless of whether the substance comes from a foreign country or from the United States. Any article brought into Guam from outside of Guam is therefore "imported" within the meaning of Guam's drug laws. Because Guam Customs officers are statutorily empowered to arrest individuals who "import" drugs into Guam, *see* 5 Guam Code Ann. § 73102(a), and because it is an act of importation to bring drugs to Guam from the United States, we hold that Guam Customs officers are statutorily authorized to stop and seize individuals they suspect of bringing drugs to Guam, even if the person arrived on a flight originating in the United States.

[4] Even if we were not convinced by the plain language of the statute, we would reach the same conclusion based on the structure of Guam customs law. Guam is not part of the United States customs territory, and has its own customs zone. *See* 19 U.S.C. § 1401(h) (defining "United States" in the Tariff Act of 1930 as "all Territories and possessions of the United States except . . . Guam"); 19 C.F.R. § 7.2(a) (noting that Guam is "outside the customs territory of the United States"). Imports into Guam are not governed by the Tariff Act of 1930, and Guam has its own customs administration. *See* 19 C.F.R. § 7.2(b) ("The customs administration of Guam is under the Government of Guam."). Thus, although Guam is geopolitically part of the United States, an item passing

from the United States into Guam leaves one customs territory, and its administration, and enters another. *See id.* It therefore makes sense that, for purposes of Guam customs law, any item arriving in Guam from outside of Guam — even if coming from the United States — is subject to customs inspection.[3]

Rowland's additional arguments in support of his interpretation cannot compete with the clarity of the statutory scheme. His reliance on our en banc decision in *United States v. Cabaccang*, 332 F.3d 622, is misplaced. In *Cabaccang*, we reversed a conviction for importation of controlled substances in violation of 21 U.S.C. § 952(a). The Cabaccang brothers caused large amounts of methamphetamine to be shipped on nonstop commercial airline flights from California to Guam. *See Cabaccang*, 332 F.3d at 623-24. Federal law makes it unlawful "to import into the United States from any place outside thereof, any controlled substance," *see* 21 U.S.C. § 952(a), and the Cabaccangs were convicted of violating that section, *see Cabaccang*, 332 F.3d at 624. Our prior decisions had held that transporting drugs from one point in the United States to another through international airspace constituted importation. *See Guam v. Sugiyama*, 846 F.2d 570, 572 (9th Cir. 1988), *overruled by Cabaccang*, 332 F.3d at 634-35; *United States v. Perez*, 776 F.2d 797, 801 (9th Cir. 1985), *overruled by Cabaccang*, 332 F.3d at 634-35. In *Cabaccang*, we sat en banc and overruled those cases, holding that drugs that pass through international airspace on a nonstop flight from one U.S. location to another are not from "outside" the United States for purposes of 21 U.S.C. § 952(a). *See Cabaccang*, 332 F.3d at 635.

---

[3]Other sections of the customs title of the Guam Code support our conclusion. Within the customs title of the Guam Code, one section refers to "exportation to the United States" of animal products. *See* 5 Guam Code Ann. § 73106. If sending something to the United States is "exportation," then receiving something from the United States is likely "importation."

[5] The statute in *Cabaccang* prohibited transportation of drugs into the United States, and the critical question was whether passage through international airspace rendered drugs "imported." Here, there has been no suggestion that the drugs were imported due to passage through international airspace; instead, we know that the drugs were "imported" because they were introduced "into any area on Guam" from outside of Guam. *See* 9 Guam Code Ann. § 67.600. Because Guam has its own customs zone and a different definition of "imported," importation into the United States under 21 U.S.C. § 952 and importation into Guam under Guam's customs laws are not analogous. Guam is part of the United States for purposes of federal drug law, *see* 21 U.S.C. § 802(26), (28), but not for customs purposes. *Cabaccang* is inapposite to the case at bar.

Rowland also argues that we must suppress the evidence in this case because of our prior decision in *United States v. Mendoza-Ortiz*, 262 F.3d 882. In that case, United States Customs officers inspected a truck entering the United States at Nogales, Arizona, and learned that it contained marijuana. *See Mendoza-Ortiz*, 262 F.3d at 884. Instead of seizing the drugs, the officers followed the truck to its point of delivery in Compton, California to arrest potential co-conspirators. *See id.* The officers surveilled the suspected contraband for four days, and watched as it was moved into a building. *See id.* The customs officers then entered the building without a warrant and arrested Mendoza-Ortiz. *See id.* We held that the motion to suppress should have been granted because the officers were *required by statute* to obtain a warrant. *See id.* at 885. Specifically, if a U.S. Customs officer believes that goods that violate customs laws are in a "dwelling house, store, or other building or place," he is "required to seek a warrant" to enter such building. *Id.* (citing 19 U.S.C. § 1595(a)). It was due to the statutory violation that the evidence was suppressed in that case.

The instant case is distinct from *Mendoza-Ortiz* because the Guam Customs officer did not violate a statutory command.

Indeed, it appears that the officer was statutorily *authorized* to make the stop, as set forth above. We do not agree with Rowland that *Mendoza-Ortiz* compels us to order suppression in this case.

Finally, Rowland argues that section 67.601 of title 9 of the Guam Code and section 73126 of title 5 of the Guam Code support his position. First, he argues that section 67.601 indicates that an item must come from a foreign country to be imported. That argument is squarely rejected by the broad definition of "import" in the preceding subsection, a subsection that Rowland does not address. *See* 9 Guam Code Ann. § 67.600 (defining "import" as "any bringing in or introduction of any such article into any area on Guam"). Turning to his second argument, section 73126 empowers Guam Customs officers to conduct *suspicionless* searches of *baggage* arriving on flights originating outside of the United States. Rowland asserts that the corollary is that Guam Customs officers lack the statutory authority to conduct searches and seizures of passengers arriving on flights from the United States. We are not persuaded. That Guam's legislature has empowered its customs authorities to inspect *baggage* arriving on international flights is irrelevant to the question whether customs authorities may stop *persons* they reasonably suspect of violating Guam's drug laws.

In conclusion, we think it is clear that Guam Customs officers have the statutory authority to stop and question an individual suspected of smuggling drugs into Guam, so long as the person is arriving from outside of Guam. It is immaterial whether the flight originated within the United States or in some other country: the statute prohibits "any bringing in" of drugs "into any area on Guam." 9 Guam Code Ann. § 67.600. Because we conclude that the Guam Customs officer in this case was statutorily authorized to stop Rowland if he reasonably suspected that Rowland was trafficking in a controlled substance, we must next determine whether the officer had reasonable suspicion to stop Rowland.

IV.  *Reasonable Suspicion*

[6] An officer may stop and question an individual sus-
pected of wrongdoing if the officer can point to "specific and
articulable facts which, taken together with rational inferences
from those facts, reasonably warrant that intrusion." *Terry v.
Ohio*, 392 U.S. 1, 21 (1968) (footnote omitted). When a court
is considering whether an informant's tip is sufficient to sup-
port a finding of probable cause or reasonable suspicion, the
court must employ a "totality-of-the-circumstances approach"
that takes into consideration the informant's "veracity" or "re-
liability" and his "basis of knowledge." *Illinois v. Gates*, 462
U.S. 213, 238 (1983).

While the probable cause requirement for a warrant
requires a "fair probability that contraband or evidence of a
crime will be found," reasonable suspicion is less demanding
and "can arise from information that is less reliable than that
required to show probable cause." *Alabama v. White*, 496
U.S. 325, 330 (1990) (citations omitted). "Reasonable suspi-
cion, like probable cause, is dependent upon both the content
of information possessed by police and its degree of reliabil-
ity. Both factors — quantity and quality — are considered in
the totality of the circumstances . . . ." *Id.* (internal citation
omitted). "Thus, if a tip has a relatively low degree of reliabil-
ity, more information will be required to establish the requi-
site quantum of suspicion than would be required if the tip
were more reliable." *Id.*

[7] Courts look to several factors to determine the reliabil-
ity of an informant's tip. First, a known informant's tip is
thought to be more reliable than an anonymous informant's
tip. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000); *Adams v.
Williams*, 407 U.S. 143, 146-47 (1972). That is because an
anonymous informant typically cannot be questioned about
the basis for knowing the information or motive for providing
the tip, nor can the anonymous informant be held accountable
for providing false information in violation of the law. *See*

*J.L.*, 529 U.S. at 271; *Adams*, 407 U.S. at 146-47. Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant. *See Adams*, 407 U.S. at 146-47. Third, the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip — how the informant came to know the information. *See Spinelli v. United States*, 393 U.S. 410, 416 (1969), *abrogated on other grounds by Gates*, 462 U.S. at 238. Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source. *See White*, 496 U.S. at 329-30; *Gates*, 462 U.S. at 243-45; *Draper v. United States*, 358 U.S. 307, 313 (1959). Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, *see White*, 496 U.S. at 332; *J.L.*, 529 U.S. at 272, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities, *see Gates*, 462 U.S. at 245 n.13.

[8] Here, several indicia of reliability were present that support the informant's tip. The informant in this case made himself known to the DEA agents, and the agents met with the informant personally. *See generally United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004) (noting that face-to-face encounter with informant significantly bolsters reliability because officers may "perceive and evaluate personally an informant's mannerisms, expressions, and tone of voice" and because informant knows that he may be tracked down and held accountable for false assertions). Further, the informant did not have any apparent motive to fabricate the tip, and could presumably have been held accountable if his information proved to be false. *See United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) (observing that exposure to legal sanction for providing false information increases reliablility of tip). Regarding the basis of the informant's knowledge, the informant stated that he had personal knowl-

edge of Rowland's activities because he had "dealt with him in the past."

[9] The informant, although not of proven reliability, gave a general description of Rowland, predicted Rowland's future travel from Hawaii to Guam, and accurately stated that Rowland was on probation in Hawaii. The DEA agents corroborated the informant's tip when they contacted the probation office in Hawaii and confirmed that Rowland lived in Hawaii and was on probation there. Rowland's criminal background, provided by the probation office, revealed past drug convictions. The informant in this case provided sufficient detail to dispel concerns that the tip was a hoax. *See White*, 496 U.S. at 333 (Stewart, J., dissenting) (expressing concern that if a generalized tip is sufficient to create reasonable suspicion, "[a]nybody with enough knowledge about a given person to make her the target of a prank, or to harbor a grudge against her, will certainly be able to formulate a tip about her").

[10] Although the totality of the circumstances in this case might not be enough to establish probable cause, here we deal instead with the less demanding reasonable suspicion standard. *See White*, 496 U.S. at 330. We hold that the totality of the circumstances in this case provided "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the stop at Guam Customs.[4] *Gates*, 462 U.S. at 238.

## V. *Disclosure of the Informant's Identity*

[11] Finally, Rowland asserts that the district court abused its discretion when it denied his motion for pretrial discovery of information related to the confidential informant. In *Rov-*

---

[4]Because we conclude that the stop was justified by reasonable suspicion, we express no opinion on whether Rowland's stop at Guam Customs was a "border search" within the meaning of *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985).

*iaro v. United States,* 353 U.S. 53, the Supreme Court held that an informant's identity must be revealed whenever it "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60-61. But the right is not absolute. "[N]o fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. The court must examine "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* The defendant's need for information must be balanced against the value of ensuring the safety of informants. *See United States v. Napier,* 436 F.3d 1133, 1136 (9th Cir. 2006) (citing *Roviaro,* 353 U.S. at 60-64).

**[12]** We have held that a defendant is *sometimes* entitled to disclosure of the informant's identity, but only after "mak[-ing] specific allegations that indicate the portions of the warrant claimed to be false" and making "a contention of deliberate falsehood or reckless disregard for the truth." *See United States v. Kiser,* 716 F.2d 1268, 1271 (9th Cir. 1983). Here, everything the informant reported turned out to be accurate. Where a defendant "has failed to articulate any substantial reason" why he should be entitled to the confidential information, disclosure is not appropriate. *Napier,* 436 F.3d at 1139.

**[13]** Rowland claims that he needs the information to investigate the informant's credibility and background, but he has not articulated any specific reasons to disbelieve the informant's testimony. Our cases do not permit Rowland to go on a fishing expedition into the informant's background because "a mere suspicion that the information will prove helpful will not suffice" to demonstrate a need for disclosure. *United States v. Williams,* 898 F.2d 1400, 1402 (9th Cir. 1990).

**[14]** We have little doubt that the district court did not abuse its discretion when it denied Rowland's motion. A court abuses its discretion if its decision "lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000). Here, it appears that the district court correctly and scrupulously followed the balancing procedures set forth in *Roviaro* and by this court, and that Rowland did not carry his burden. We hold that the district court did not abuse its discretion when it denied Rowland's motion for pretrial discovery.

## VI. *Conclusion*

We hold that under Guam law, Guam Customs officers are statutorily authorized to stop and question individuals that they reasonably suspect are violating Guam's drug importation laws, without regard for whether the flight originated in the United States or in a foreign country. In this case, the totality of the circumstances gave rise to a reasonable suspicion that Rowland was violating Guam's drug importation laws. Accordingly, the district court properly denied Rowland's motion to suppress. Finally, we hold that the district court did not abuse its discretion when it denied Rowland's motion for pretrial discovery.

The judgment of the district court is **AFFIRMED**.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West.